UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CARL ANDERSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>COMCAST CORPORATION (formerly AT&T Comcast Corp.), COMCAST CABLE COMMUNICATIONS INC., COMCAST HOLDINGS CORPORATION, (formerly Comcast Corporation), COMCAST CABLE COMMUNICATIONS HOLDINGS, INC. (formerly AT&T Broadband, Corp.), COMCAST CABLE HOLDINGS, LLC (formerly AT&T Broadband, LLC and TeleCommunications, Inc.), COMCAST MO GROUP, INC (formerly MediaOne Group, Inc.), COMCAST MO of DELAWARE, INC. (formerly Media One of Delaware, Inc. and Continental Cablevision, Inc.), COMCAST OF MASSACHUSETTS II, Inc. and AT&T CORP.,<br><br>Defendants. | C.A. No. 3:06-cv-30002-MAP |

**DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION**

## I. INTRODUCTION

On November 16, 2005, Plaintiff's counsel filed this putative nationwide class action, after having filed an earlier, virtually identical class action in Pennsylvania in 2004. Both actions are based on unsupported and hard to decipher allegations of a widespread scheme perpetrated by Comcast Corporation and the other defendants (collectively "Comcast") and its predecessors to flout the Federal Communications Commission's ("FCC") technical equipment

compatibility and related regulations for the cable television industry.  Complaint ¶¶ 2-3.  Built entirely on gross distortions of those regulations and the purposes that drove their adoption, Plaintiff Carl Anderson, in the present action ("Plaintiff"), and Philip Thibodeau, in the Pennsylvania action, allege that they and thousands of cable subscribers were or are being "overcharged" for converter boxes and remote control devices that are, according to Plaintiff, "unnecessary."  Defendants move to compel arbitration under Plaintiff's Subscriber Agreement, in which Plaintiff expressly agreed to arbitrate "any claim or dispute related to or arising out of [his cable television Subscriber Agreement] or services provided."  Plaintiff's claims, all of which are preempted by, and necessarily arise exclusively under, federal law,[1] plainly relate to the cable services provided to him.

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14 (2005), this Court should "rigorously enforce" Plaintiff's agreement to arbitrate, *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985), and resolve any doubts as to arbitrability "in favor of arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.").  The arbitration provision at issue here has been previously enforced by an Illinois state court in *Cohen v. AT&T Broadband Management Corp.*, No. 01 CH 21535, slip op. (Circuit Court of Cook County, Illinois, County Dept., Chancery Div., Jan. 24, 2003) (compelling arbitration of cable subscriber's claims under subscriber agreement) (attached as Exhibit 1), and a similar one was enforced by the Seventh Circuit in *Boomer v. AT&T Corp.*, 309 F.3d 404 (7th Cir. 2002) (compelling arbitration of long distance service subscriber's claims

---

[1]    Although Plaintiff purportedly asserts state law claims for consumer fraud, breach of contract, and related claims, federal law controls and precludes claims articulated under state law theories. *See* Notice of Removal ¶ 12; discussion *infra*.

under subscriber agreement). Although federal law should apply here, to the extent the Court believes state law is applicable, Massachusetts law strongly favors arbitration, *see* Mass. Gen. Laws ch. 251, § 1 (2005), even in situations where the arbitration provision was subsequently added to an existing agreement, *see DeLuca v. Bear Stearns & Co., Inc.*, 175 F. Supp. 2d 102 (D. Mass. 2001) (Saris, J.).

Pursuant to the plain and unambiguous terms of his Subscriber Agreement, and in the interests of judicial economy considering the ongoing identical action in Pennsylvania, discussed *infra*, the Court should compel Plaintiff to arbitrate his claims and either dismiss or stay this action.[2]

## II. PROCEDURAL HISTORY

### A.    The Earlier Filed Pennsylvania Action

On May 14, 2004, Philip Thibodeau, who, like Plaintiff, lives in Springfield, Massachusetts, filed a putative nationwide class action against Comcast in the Philadelphia Court of Common Pleas alleging that Comcast had overcharged for unnecessary converter boxes and remote controls. *See Thibodeau v. Comcast*, No. 4526, 2006 Phila. Ct. Com. Pl. LEXIS 59, at *2 (Penn. Commw. Ct. Jan. 24, 2006); Affidavit of Richard Hand ¶ 7 (attached as Exhibit 2). The complaint alleged two putative nationwide classes: the first was comprised of all present or former customers of Comcast basic or standard service who had paid Comcast rental charges for a converter box since May 31, 1994; the second was comprised of present or former customers of Comcast "that rented and paid for a remote control at any time from May 31, 1994 to the present." *See Thibodeau v. Comcast*, No. 04-1777, 2004 U.S. Dist. LEXIS 20999, at *2-3 (E.D. Pa. Oct. 21, 2004). After Comcast removed the action to the Eastern District of Pennsylvania,

---

2    "A court may dismiss, rather than stay, a case when all of the issues before the court are arbitrable." *Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 156 (1st Cir. 1998).

the federal court remanded it to the Philadelphia Court of Common Pleas, where it has yet to

receive class certification. *See Thibodeau*, 2006 Phila Ct. Com. Pl. LEXIS 59, *2.[3]

**B.      The Massachusetts Action**

While the Pennsylvania action was pending, Plaintiff, represented by the same counsel as

Mr. Thibodeau, filed the present action in Massachusetts Superior Court, Hampden County, on

November 16, 2005. *See* Complaint. The Complaint asserts precisely the same allegations as

the Pennsylvania action and covers the same prospective class members -- specifically,

nationwide customers of Comcast or AT&T who rented and paid for converter boxes or remote

controls. *See id.* at ¶¶ 74-76. Plaintiff limits the two nationwide classes taken from the

Pennsylvania action to Massachusetts residents and alleges a third nationwide class, for which he

alleges violations of all fifty states' consumer protection laws, consisting of subscribers who

rented and paid for converter boxes or remote controls.[4] Comcast timely removed the action to

this Court on January 5, 2006 under 28 U.S.C. § 1332, as amended by the Class Action Fairness

Act of 2005. *See* Def. Notice of Removal.

In the interests of public policy and judicial economy, Plaintiff's forum shopping should

not be rewarded. *See* Manual for Complex Litigation (Fourth) § 21.15 (2005) (stating that

"judges should avoid facilitating such adversarial contests" as a race to certification when

competing class actions are ongoing); *Allapattah Servs. v. Exxon Corp.*, 362 F.3d 739, 764 (11th

---

[3]      The Pennsylvania Court of Common Pleas recently held that the class action bar in the arbitration
provision was not enforceable. In that decision, the Court erroneously applied Pennsylvania law,
even though Mr. Thibodeau is a Massachusetts resident, his services were received in
Massachusetts, and his Subscriber Agreement was formed in Massachusetts. *Id.* at *25. That
decision is currently on appeal in Pennsylvania.

[4]      The subscribers who rented converter boxes in the third class are limited, inexplicably, to those
who rented from May 31, 1994 to July 1998 (sic). Otherwise, the time period is the same as in
the first and second class.

Cir. 2004) ("Forum-shopping is of particular concern in nationwide class action suits, where plaintiffs' attorneys can essentially cherry-pick whom they wish to make a named plaintiff and decide for themselves the district and circuit in which to file suit."). Federal courts in Massachusetts consider a plaintiff's attempt at forum shopping as a relevant factor when deciding upon the application of substantive law. *E.g.*, *In re Relafen Antitrust Litigation*, No. 01-12239-WGY, 2004 U.S. Dist. LEXIS 8539, at *92 (D. Mass. May 12, 2004) (Young, C.J.) (applying New York consumer protection law because not to do so would encourage forum shopping among class action plaintiffs).

### III. FACTUAL BACKGROUND

**A.   Plaintiff Is A Comcast Customer Who Receives Services Subject to a Subscriber Agreement.**

Plaintiff has been a cable subscriber in Springfield, Massachusetts since at least December 2000, and is a current Comcast subscriber today. Hand Aff. ¶ 6. A Subscriber Agreement that contains an arbitration clause governs his cable television service. Among the documents comprising his Subscriber Agreement is a document that specifically addresses subscriber disputes with Comcast. The document, entitled "Policies and Practices – Notice to Customers Regarding Policies, Complaint Procedures & Dispute Resolution" (the "Policies & Practices") (attached hereto as Exhibit 3)[5] was sent to all Springfield AT&T Broadband subscribers in 2001 and 2002 and subsequently to all Springfield Comcast subscribers in 2003. Hand Aff. ¶ 4. After the mailing, Plaintiff continued to receive all the benefits of the cable

---

5     For ease of reference, identical portions of the documents attached as Exhibit 3 are cited simply as the Policies & Practices. The 2001 Policies & Practices differs to some degree from the 2002 and 2003 Policies & Practices, however. When citing to a specific document (ie. the 2001 Policies & Practices), this Memorandum will so indicate.

services and never objected to the arbitration clause contained in the Policies & Practices. *Id.* ¶ 6.

Pursuant to his Subscriber Agreement, Plaintiff received cable service on a "month-to-month" basis. Policies & Practices ¶ 2. He could terminate his cable service at any time simply by giving notice to his cable operator. Policies & Practices ¶ 4. For example, he could cancel cable service when changes were made to the terms of service if he found such changes unacceptable. Policies & Practices ¶ 3. Continuing to accept service after the effective date of the change constitutes acceptance of the change in the terms of service. *Id.* Among the documents constituting the Subscriber Agreement, annual notices (such as the Policies & Practices) are mailed out each year pursuant to the FCC regulations, specifically 47 C.F.R. Part 76 subpart T. Moreover, a subscriber notice "is considered given when deposited in the U.S. mail." Hand Aff. ¶¶ 4-5; Policies & Practices ¶ 11. Thus, it is clear that Plaintiff was covered by the arbitration provisions mailed to him in 2001, 2002, and 2003.

**B.    Pursuant to the Subscriber Agreement, Plaintiff Has Agreed to Arbitrate All of His Claims, and Has Further Agreed That His Claims Will Not Be Arbitrable in a Class Action.**

The Subscriber Agreement contains a broad arbitration provision that covers "any claim or dispute related to or arising out of [the Subscriber Agreement] or the services provided":

> 10. **MANDATORY AND BINDING ARBITRATION**
> IF WE ARE UNABLE TO RESOLVE INFORMALLY
> ANY CLAIM OR DISPUTE RELATED TO OR ARISING
> OUT OF THIS AGREEMENT OR THE SERVICES
> PROVIDED, *WE HAVE AGREED TO BINDING
> ARBITRATION...*

2002, 2003 Policies & Practices ¶ 10 (capitalization in original, emphasis added). The Subscriber Agreement also specifically exempts claims from being arbitrated on a class basis:

> *THERE SHALL BE NO RIGHT OR AUTHORITY FOR*
> *ANY CLAIMS TO BE ARBITRATED ON A CLASS*
> *ACTION* OR CONSOLIDATED BASIS OR ON A BASIS
> INVOLVING CLAIMS BROUGHT IN A PURPORTED
> REPRESENTATIVE CAPACITY ON BEHALF OF THE
> GENERAL PUBLIC ..., OTHER SUBSCRIBERS, OR
> OTHER PERSONS SIMILARLY SITUATED UNLESS
> YOUR STATE'S LAWS PROVIDE OTHERWISE.

*Id.* (capitalization in original, emphasis added). Furthermore, the arbitration provision included in the 2001 Policies & Practices sent by AT&T to Plaintiff explicitly provided that the provision was retroactive. *See* 2001 Policies & Practices ¶ 10 (stating that arbitration clause applied to all disputes between customer and the Company "WHETHER ARISING BEFORE OR AFTER THE EFFECTIVE DATE") (capitalization in original). The 2001 Policies & Practices also included a bar on class-wide arbitration. *Id.*

**C.     Plaintiff's Subscriber Agreement Contains Procedural Safeguards That Benefit Plaintiff.**

The arbitration provision contains various procedural safeguards for subscribers. For example, the subscriber is given a choice of arbitration services and is provided with a convenient forum. *Id.* Furthermore, the subscriber is not responsible for the filing fee in the arbitration, nor the arbitrator's costs and expenses.[6] *Id.* Finally, not every claim is subject to arbitration. The subscriber may litigate some claims, such as those brought under 47 U.S.C. § 551 (providing a private right of action for the enforcement of privacy provisions in the Cable Act). *Id.*

---

[6]     This fact counters any potential argument by Plaintiff that arbitration will be prohibitively expensive so as to prevent him from bringing his claim. *See Large v. Conseco Fin. Serv. Corp.*, 292 F.3d 49, 56-57 (1st Cir. 2002) (rejecting argument that arbitration will be prohibitively expensive because defendant had specifically agreed to pay plaintiff's arbitration costs); *Mattox v. Decision One Mortgage Co.*, No. 01-10657-GAO, 2002 U.S. Dist. LEXIS 18066, *13 (D. Mass. Sept. 26, 2002) (O'Toole, J.).

On November 16, 2005, Plaintiff filed his Complaint.  Rather than seeking to arbitrate his claims, he raises them in a putative class action.

## IV. ARGUMENT

**A.    FEDERAL LAW MANDATES A STRONG PRESUMPTION IN FAVOR OF ARBITRABILITY AND A STAY OF ALL COURT PROCEEDINGS.**

The FAA applies to the arbitration provision contained in Plaintiff's Subscriber Agreement and requires Plaintiff to abide by his agreement to arbitrate.  Under the FAA, "[a] written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... *shall be valid, irrevocable, and enforceable.*"  9 U.S.C. § 2 (emphasis added).  Section 3 of the FAA further provides for a stay of proceedings where the court is satisfied that the issue before it is arbitrable, and in Section 4 for an order compelling arbitration if there has been a "'failure, neglect, or refusal' of any party to honor an agreement to arbitrate."  *Scherk v. Alberto-Culver Co.*, 417 U.S 506, 511 (1974) (enforcing clause in purchase and sale contract requiring arbitration of claims arising out of the contract in Paris).

The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Perry v. Thomas*, 482 U.S. 483, 489 (1987); *see also Puerto Rico Telephone Co. v. U.S. Phone Man. Co.*, 427 F.3d 21, 26 (1st Cir. 2005) ("In light of the FAA's explicit purpose to override state law that impedes the enforceability of arbitration agreements, it is well established that the provisions of the FAA will prevail over contrary state-law rules.").  Indeed, in enacting the FAA, Congress intended "to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause." *Perry*, 482 U.S. at 490.  The duty to arbitrate applies to any claim that is

arbitratable and the FAA expressly applies to cable television service and "commerce" of the kind at issue in this dispute.  9 U.S.C. §§ 1, 2.[7]

As the Supreme Court has explained, Congress intended that the FAA would serve as a vehicle to overcome state-imposed obstacles to arbitration.  *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 56 (1995) ("[T]he FAA not only declared a national policy favoring arbitration but actually withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.") (internal quotations omitted).  This week, in fact, the Supreme Court reaffirmed that the FAA "created a body of federal substantive law, which [is] applicable in state and federal court" by overruling a Florida Supreme Court decision refusing to enforce an arbitration provision on the grounds that it would violate *state* law.  *Buckeye Check Cashing Inc. v. Cardegna*, No. 04-1264, 2006 U.S. LEXIS 1814, at *9 (U.S. Feb. 21, 2006) (internal citations and quotations omitted).

"Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Mose H. Cone*, 460 U.S. at 24-25.  Furthermore, "[a]rbitration agreements are unenforceable under § 2 of the FAA only where the agreement would be revocable under state contract law."  *Vimar Seguros Y Reaseguros, S.A. v. M/V Sky Reefer*, 29 F.3d 727, 731 (1st Cir. 1994), *aff'd* 515 U.S. 528 (1995).  Thus, because the arbitration provision is valid, this Court should enforce the agreement to arbitrate and allow the arbitrator to consider any other challenges to the Subscriber Agreement.

---

7       The FAA applies to the Subscriber Agreement because the provision of cable television service involves a transaction in interstate commerce, a fact conceded by Plaintiff in his Complaint. *See* Complaint ¶ 12; *see also* 47 U.S.C. § 151 (stating that the Communications Act of 1934 was enacted for the purpose of "regulating interstate and foreign commerce in communication by wire and radio").

To the extent that state arbitration law may be relevant, Massachusetts encourages

arbitration as an "expeditious alternative to litigation." *Danvers v. Wexler Constr. Co.*, 422 N.E.

2d 782, 784 (Mass. App. Ct. 1981). The Massachusetts' Uniform Arbitration Act, patterned after

the FAA, establishes that arbitration agreements are "valid, enforceable and irrevocable, save

upon such grounds as exist at law or in equity for the revocation of any contract." Mass. Gen.

Laws ch. 251, § 1 (2005).

**B.    THE CABLE ACT AND FCC REGULATIONS GOVERN THE SUBSCRIBER RELATIONSHIP WITH COMCAST.**

    **1.    Congress and the FCC Have Set Forth A Specific Legislative Scheme To Cover Cable Subscriber Notices.**

Plaintiff's Subscriber Agreement expressly provides for arbitration. Such agreements are

common in the cable television and telecommunications industry.[8] Congress and the FCC have

set forth a regulatory scheme that permits cable operators to address and later modify dispute

resolution procedures via subscriber notices, such as those contained in Plaintiff's Subscriber

Agreement. Under the Cable Television and Consumer Protection and Competition Act of 1992

(P.L. 102-385, 106 Stat. 1460), Congress directed the FCC to "establish standards by which

cable operators may fulfill their customers service requirements." 47 U.S.C. § 552(b). In

establishing these standards, the FCC stated:

> *The Commission will require cable operators to provide written information* at the time of installation and, at least annually, to all subscribers on products and services, prices and options and conditions of subscription to programming and other services, installation and service maintenance policies, instructions on how to use the cable system, and *billing and complaint procedures.*

---

8    *See, e.g.,* Time Warner Cable Modem Service Subscription Agreement at ¶ 13, *available at* http://www.timewarnercable.com/centralny/customer/policies/cmservicesubscriptionagreement.html.

*Implementation of Section 8 of the Cable Television Consumer Protection Act of 1992 –*
Consumer Protection and Customer Service, FCC Report and Order, 58 FR 21107, 21108, ¶ 10
(1993) (emphasis added).  Furthermore, Section 552(c) of the Communications Act plainly states
that a "cable operator may provide notice of service and rate changes to subscribers using any
reasonable written means at its sole discretion."  47 U.S.C. § 552(c); *see In re Implementation of*
*the Cable Reform Provisions of the Telecommunications Act of 1996*, 61 Fed. Reg. 18968, 18973
(1996) (explaining that the revised Section 552(c) of the Communications Act authorized the use
of bill stuffers, as well as less conspicuous methods, as valid notice of a change in subscriber
agreements).  In the present case, Plaintiff received more than adequate notice of the terms of the
Subscriber Agreement.

> **2.    The Subscriber Notices in This Case Provided Ample and Conspicuous**
> **Notice to Plaintiff.**

The Subscriber Agreement at issue in this case – containing the mandatory arbitration
provision – was mailed as an annual notice to Plaintiff in or about November 2001 and again in
2002 and 2003, pursuant to 47 U.S.C. § 552 and 47 C.F.R. Part 76, Subpart T, and pursuant to
the cable operator's usual practice of providing notice using standard mailing procedures.  Hand
Aff. ¶¶ 4-6.[9]  Conspicuously, the words "Important Notices To Our Customers" appeared in
large letters on the front page of the 2001, 2002, and 2003 Policies & Practices.  Additionally, in
large bold letters, the 2002 and 2003 Policies & Practices states:  "This Document Contains
Important Information Regarding Our Policies and Practices, Including Complaint Procedures,
Arbitration And Dispute Resolution."  Finally, the arbitration provision itself contained in

---

9       In Massachusetts, a mailing in the ordinary course of business is prima facie proof of receipt of
        the mailing.  "The mailing of a letter properly addressed and postpaid, does not merely create a
        presumption but rather constitutes prima facie evidence of delivery to the addressee in the
        ordinary course of mail."  *Hobart-Farrell Plumbing & Heating Co. v. Klayman*, 19 N.E. 2d 805,
        807 (Mass. 1939) (citations omitted).

paragraph 10 of the 2002 and 2003 Policies & Practices is in all capital letters, as are the words contained in the heading of the paragraph (i.e., "MANDATORY AND BINDING ARBITRATION").

The 2001 mailing alerted Plaintiff of a change concerning arbitration of disputes with their cable provider. Under the bold type, capitalized heading DISPUTE RESOLUTION, the clause reads: "IT IS IMPORTANT THAT YOU READ THE ENTIRE SECTION CAREFULLY BECAUSE IT AFFECTS RIGHTS YOU MAY HAVE HAD OTHERWISE." 2001 Policies & Practices ¶ 10. Thus, Plaintiff was afforded an opportunity to disconnect his service upon receiving the 2001 Policies & Practices, but declined to do so. Hand Aff. ¶ 6.[10] Rather, he continued to use the cable service after receiving the Policies & Practices. *Id.* Under the Subscriber Agreement, continued use of the service by the subscriber constitutes acceptance of changes to the terms and conditions of the service provided. Policies & Practices ¶ 1. Courts have enforced arbitration clauses under similar circumstances where an arbitration clause was added to a consumer services contract as a subsequent amendment via mailed notice. *See, e.g., In re Universal Serv. Fund Tel. Billing Practices Litig.,* 300 F. Supp. 2d 1107, 1122-24 (D. Kan. 2003) (citing cases); *Vigil v. Sears Nat'l Bank,* 205 F. Supp. 2d 566, 568 (E.D. La. 2002); *Beneficial Nat'l Bank, USA v. Payton,* 214 F. Supp. 2d 679, 686 (S.D. Miss. 2001); *Lloyd v. MBNA Am. Bank, N.A.,* No. 00-109-SLR, 2001 U.S. Dist. LEXIS 8279, at *10-11 (D. Del. Feb. 22, 2001).

Accordingly, the Subscriber Agreement, with its accompanying arbitration provision, was both offered and accepted under federal law.

---

10      FCC regulations require cable operators to provide their subscribers with thirty days advance notice before any significant changes to their cable service becomes effective. *See* 47 C.F.R. § 1603.

C.    **THE SUBSCRIBER AGREEMENT CONTAINS A BROAD ARBITRATION CLAUSE WHICH ENCOMPASSES PLAINTIFF'S CLAIMS.**

   1.    **There Is Little Doubt That Plaintiff's Claims Arise Out of the Subscriber Agreement.**

The Subscriber Agreement contains a broad arbitration provision covering "any claim or dispute *related to* or *arising out of* [the Subscriber Agreement] or the services provided." 2002, 2003 Policies & Practices ¶ 10 (emphasis added).[11]  Such "related to or arising out of" type arbitration clauses are given broad construction.  *See, e.g., Fluehmann v. Assoc. Fin. Serv.*, No. 01-40076-NMG, 2002 U.S. Dist. LEXIS 5755, at *17 (D. Mass. March 29, 2002) (Gorton, J.) (enforcing arbitration clause in mortgage agreement against one co-tenant, who did not sign the agreement, due to "arising under" or "related to" language) ("When confronted with such broad language, courts presume the validity of an agreement to arbitrate, and generally find that similarly broad arbitration clauses governing all disputes arising under the agreement apply even to a nonsignatory.") (internal citations and quotations omitted).  As this Court has stated, the "presumption [of arbitrability] is particularly applicable where the clause is broad." *Raytheon Co. v. Donovan*, 208 F. Supp. 2d 99, 104 (D. Mass. 2002) (Collings, M.J.) (internal citations omitted).  Accordingly, as the scope of the arbitration provision in the Subscriber Agreement covers the allegations asserted in this action, the Court should compel Plaintiff to arbitrate his claims.

---

11    The 2001 Policies & Practices included different but similarly broad language: "Any and all disputes arising between you and the Company… must be resolved by final and binding arbitration. This includes *any and all disputes based on any product, service, or advertising connected to the provision or use of the service.*"  2001 Policies & Practices ¶ 10 (emphasis added).

2.     **Courts Reviewing The Same Arbitration Provision As That Contained in the Subscriber Agreement Have Compelled Arbitration**.

An Illinois court has already compelled a cable subscriber to arbitrate his claims arising under the same Subscriber Agreement at issue as in the instant case. *Cohen, supra,* No. 01 CH 21535. Avery Cohen was a subscriber to AT&T's high speed Internet service and cable television service in Cook County, Illinois. *Id.* at 2. Cohen became dissatisfied with changes made to this Internet service and in June 2002 filed a class action complaint. AT&T Broadband, now owned by Comcast, moved to compel arbitration on the basis that the arbitration clause – the same clause Plaintiff now seeks to avoid – mandated arbitration. *Id.* The court agreed and stayed the action. The *Cohen* court held that notices similar to those mailed to Plaintiff in this action were valid, enforceable contracts. *Id.* at 2-5. As here, the subscriber had been given an opportunity to cancel the service when the arbitration provision was added, but the subscriber continued to receive service and therefore, was bound to arbitrate his claims:

> Cohen was given a reasonable period to stop using the services, which would thus notify AT&T that he did not accept the contract terms of either the Video Notice or the Subscriber Agreement. Yet, he continued to use both his cable television and Internet service. . . . Thus, Cohen's silence and continued use of the services after receiving the Legal Notice, email, and letter binds him to the terms of the Video Notice and Subscriber Agreement.

*Id.* at 7.

Plaintiff is no different than the subscriber in the *Cohen* case. Like the subscriber in *Cohen*, he received the Subscriber Agreement by mail, but did not have his service disconnected. Hand Aff. ¶ 6. Instead, he, like the subscriber in *Cohen*, continued his service. *Id.* Accordingly, he, like the subscriber in *Cohen*, is bound by the arbitration provision in his Subscriber Agreement and should be compelled to arbitrate his claims. *See also Boomer,* 309 F.3d at 415-17 (enforcing a similar arbitration clause in a consumer class action under the Communications

Act concerning overcharges for telephone service where each subscriber was afforded a reasonable opportunity to reject the clause by discontinuing the service before becoming bound to arbitrate).[12]

### 3. Massachusetts Law Also Dictates Enforcement of the Arbitration Agreement.

Even if this Court were to conclude that state law, rather than federal law,[13] applies to any contract issues that might be relevant, Massachusetts law would also dictate enforcement of the arbitration agreement.  First, as previously stated, the Massachusetts' Uniform Arbitration Act is patterned after the FAA and establishes that arbitration agreements are "valid and enforceable and irrevocable, save upon such grounds as exist at law or in equity for revocation of any contract."  Mass. Gen. Laws ch. 251, § 1.  "There is a strong public policy in Massachusetts favoring arbitration as an alternative to litigation."  *Barnstead v. Ridder*, 659 N.E. 2d 753, 754-55 (Mass. 1996).  The holdings in *Boomer* and *Cohen* are consistent with the holdings of Massachusetts courts that have considered the enforceability of subsequently-added arbitration clauses to agreements between parties.  In *DeLuca v. Bear Stearns & Co., Inc.*, 175 F. Supp. 2d 102 (D. Mass. 2001) (Saris, J.), for example, a stockbroker brought a Title VII employment discrimination action against her employer which moved to compel arbitration of the

---

12    In an earlier case, the U.S. District Court in Massachusetts ruled that the arbitration provision found in the *2002 and 2003* Policies & Practices did not apply retroactively, without deciding whether the arbitration provisions violate public policy or are otherwise unconscionable.  *See Rogers v. Comcast Corp.*, 341 F. Supp. 2d 42, 47 (D. Mass. 2004) (Harrington, S.J.).  This decision is now on appeal before the First Circuit.  However, the Court *did not consider* the 2001 Policies & Practices, which expressly applies the arbitration provision retroactively.  *Id.* at 44, fn. 1.

13    Where Comcast has indisputably complied with the requirements of the federal notice regulations in the Communications Act, *see* discussion *supra* at 10, any state law claims regarding the Subscriber Agreement's formation are necessarily preempted.  *See Time Warner Cable v. Doyle*, 66 F.3d 867, 882 (7th Cir. 1995) (holding state consumer law challenge to cable provider's billing practice preempted when practices were in compliance with federal regulations).

stockbroker's claims.  The employer added an arbitration clause to its employee handbook twelve years after the stockbroker was hired.  *Id.* at 105.  Although the employee acknowledged receipt of the new employee handbook, she made a notation on the agreement stating, "I do not completely understand this statement but I signed it so that I wouldn't lose my job."  *Id.*  The court compelled arbitration of the discrimination claims, finding that continued employment was consideration for the added term to the conditions of her employment.  *Id.* at 108; *see DeBlois v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, No. 85-4808-Y, 1987 U.S. Dist. LEXIS 15342, at *7 (D. Mass. July 21, 1987) (Young, J.) (holding that claims arising out of activities which began prior to the date of the arbitration agreement but continuing thereafter were arbitrable).

Plaintiff was free to cancel his service from Comcast upon receipt of the Subscriber Agreement.  That he failed to do so should not grant him the right to ignore a clear and conspicuous provision of the contract.  Like the stockbroker in *DeLuca* and the cable subscriber in *Cohen*, Plaintiff agreed to arbitrate his claims when he continued to receive service from his cable provider after receiving the Subscriber Agreement.  Accordingly, he is bound to the arbitration provision in his Subscriber Agreement and should be compelled to arbitrate his claims.

## D.   THE COURT SHOULD ENFORCE THE BAR AGAINST CLASS ARBITRATION.

Finally, the Court should enforce all provisions of the arbitration clause contained in the Subscriber Agreement – including the provision that bars arbitration on a class basis, as well as the provision requiring that claims be arbitrated within one year of the date of their occurrence.  Policies & Practices ¶ 10.  Pursuant to Section 4 of the FAA, the Court should "make an order summarily directing the parties to proceed with the arbitration *in accordance with the terms thereof.*"  9 U.S.C. § 4 (emphasis added).  Because the express terms of the arbitration provision

prohibit class arbitration, the issue of class arbitration concerns the validity of the arbitration provision rather than its interpretation and thus should be enforced by this Court. *See Green Tree Fin. Corp.*, 539 U.S. at 450 (a plurality decision stating that where arbitration provision *did not* include any language on class arbitration, the question of whether class arbitration is permissible under the contract is for the arbitrator to decide, but indicating that the issue would be resolved differently had the provision explicitly forbidden class arbitration).

The First Circuit has enforced arbitration agreements containing a class action bar. *See, e.g., Fluehmann*, 2002 U.S. Dist. LEXIS 5755, at *8 (compelling arbitration of borrower's Truth in Lending claims brought in a putative class action where arbitration provision in loan documents provided that "there shall be no class action arbitration pursuant to this agreement");[14] *Mattox v. Decision One Mortgage Co.*, No. 01-10657-GAO, 2002 U.S. Dist. LEXIS 18066, *7 (D. Mass. Sept. 26, 2002) (O'Toole, J.) ("[T]he unavailability in arbitration of procedural devices such as class action suits does not relieve a party of an obligation to arbitrate under a valid arbitration agreement."); *see also Livingston v. Associates Finance, Inc.,* 339 F.3d 553, 559 (7th Cir. 2003) (enforcing arbitration clause containing a class action bar in an action under Truth in Lending Act).

Standardized agreements are perfectly valid in Massachusetts when the agreement is not oppressive to one party in the particular circumstance.[15] *See Boulanger v. Dunkin' Donuts Inc.,* 815 N.E. 2d. 572, n. 16 (2004); *Bull HN Info. Sys., Inc. v. Hutson*, 229 F.3d 321, 331 (1st Cir.

---

14    In compelling arbitration, the Court in *Fleuhman* stayed the court action but dismissed without prejudice the defendant's motion to strike the plaintiff's class claims pending resolution of the arbitration. *Id.* at *29.

15    Comcast rejects any potential argument that the Subscriber Agreement is a so-called adhesion contract. In fact, Plaintiff was explicitly authorized in the Subscriber Agreement to offer his own terms of modification, which he chose not to do. *See* Policies & Practices ¶ 12. That choice by Plaintiff should not be used against Comcast.

2000) ("even a contract of adhesion is enforced, unless unconscionable or unfair"); Restatement

(Second) of Contracts, § 211 (1979) (stating that standardized agreements are valid unless one

party "has reason to believe that the party manifesting … assent would not do so if he knew that

the writing contained a particular term.").  Moreover, most business' today could not function

without the use of standardized agreements, which are used in almost every type of consumer

transaction, from parking a car in a public garage to airline traveling to theater going to retail

purchasing.  If all companies today were required by law to negotiate the terms of a consumer

transaction with each customer, it is not hyperbole to state that the American economy could

quickly come to a standstill.

     Indeed, this Court has enforced arbitration clauses in similar standardized contracts.  *See*

*Mattox,* No. 01-10657-GAO, 2002 U.S. Dist. LEXIS 18066, *10-11.  *Mattox* involved a class

action brought by three named plaintiffs who had contracted with loan brokers to obtain home

mortgages and alleged that the brokers did not obtain loans at the best available rates.  *Id.* at *2-

3.  In holding the arbitration rider signed at the loan closings enforceable, the Court ruled that the

plaintiffs' allegation that the arbitration provision was a "contract of adhesion" did not provide a

reason to invalidate it.  *Id.* at *10.  The Court stated that whether a contract provision is

unconscionable depends upon both the inequality of bargaining positions and the oppressive

nature of the contract, the latter factor being the more important consideration.  *Id.* at *11*; see*

*Rosenberg v. Merrill Lynch*, 170 F.3d 1, 17 (1st Cir. 1999).  As the *Mattox* Court further

explained:

> "[I]t is not possible to say categorically that all arbitration
> provisions in consumer contracts are oppressive to the consumer.
> Indeed, in the interests of the consumer there is much to
> recommend the availability of avenues for the presentation of
> claims that are less formal and more efficient than traditional civil
> litigation."

*Mattox,* No. 01-10657-GAO, 2002 U.S. Dist. LEXIS 18066, *11-12.

      Nothing is inherently oppressive about offering a customer a choice between agreeing to a service contract that includes an arbitration provision or declining the service in favor of a variety of other options. Despite its mass appeal, cable television cannot be considered an essential or necessary commodity. Competition for Comcast's subscribers is fierce from satellite television, for instance, and nothing prevented Plaintiff from canceling his service with Comcast or AT&T and signing with a satellite television provider or simply using his free access to broadcast television. Even so, Plaintiff's Subscriber Agreement provides him with various procedural safeguards specifically for his benefit, such as a convenient forum, a choice of arbitrators, an agreement by Comcast to assume the costs of the arbitration service, and excepting certain disputes from the arbitration provision itself. Policies & Practices ¶ 10.

      Finally, once an arbitration provision is found to be facially valid, a court's role in a contract dispute is concluded and any other issues concerning the interpretation of the contract or the validity of the remainder of the contract are for the arbitrator to decide. *See Cohen,* No. 01 CH 21535 at 9; *citing Paine Webber Inc. v. Mohamad Elahi,* 87 F. 3d 589, 599 (1st Cir. 1996) (holding that once a court finds that the parties have entered into a valid arbitration agreement that covers the subject matter at issue, the court "will presume that the parties have made a commitment to have an arbitrator decide all the remaining issues necessary to reach a decision on the merits of the dispute"); *Buckeye Check Cashing, Inc.,* No. 04-1264, 2006 U.S. LEXIS 1814, *9.

As Massachusetts courts have instructed in previous instances, the arbitration provision contained in plaintiff's Subscriber Agreement is not unconscionable or otherwise unenforceable and, accordingly, the Court should compel Plaintiff to submit his individual claims to arbitration.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court order Plaintiff to submit his claims to arbitration in accordance with the terms of the Subscriber Agreement, and dismiss or stay this action pending arbitration.

Dated:  February 24, 2006

Respectfully submitted,

DECHERT LLP

By: /s/ Timothy Blank
Timothy C. Blank (BBO #548670)
Joseph L. Sulman (BBO #663635)
200 Clarendon Street, 27th Floor
Boston, Massachusetts 02116
(617) 728-7100
timothy.blank@dechert.com
joseph.sulman@dechert.com

Attorneys for Defendants:
Comcast Corporation, Comcast Cable
Communications, Inc., Comcast Cable
Communications Holdings, Inc., Comcast
Holdings Corporation, Comcast Cable
Holdings, LLC, Comcast MO Group, Inc.,
Comcast MO of Delaware, Inc., Comcast of
Massachusetts II, Inc., AT&T Corp.

*Of counsel:*

Robert C. Heim
Stephen J. McConnell
Dechert LLP
Circa Center
2929 Arch Street
Philadelphia, Pennsylvania 19104
(215) 994-4000

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 24, 2006.

/s/ Timothy C. Blank_____